Filed 10/22/15  P. v. Mendoza CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RENE PEREZ MENDOZA,<br><br>    Defendant and Appellant. | H040647<br>(Santa Cruz County<br>Super. Ct. No. F25147) |

Defendant Rene Perez Mendoza was charged and convicted of selling heroin (Health & Saf. Code, § 11352, subd. (a)).  At trial, the critical issue was the identification of the person who sold heroin to an informant cooperating in a controlled buy under law enforcement supervision.  The trial court suspended imposition of sentence and granted formal probation to defendant.

Defendant presents multiple claims on appeal.  (See Pen. Code, § 1237, subd. (a).)  We find no reversible error and affirm.

I

*Evidence*

On June 13, 2013, Matthew Van Nuys, an informant who had been working with Detective Alex Martin since October 2012, made a controlled buy in the Beach Flats neighborhood of Santa Cruz.  On that date, Detective Martin, who was the senior agent of the Santa Cruz County Anticrime Team, considered Van Nuys to be a reliable informant.

Van Nuys had worked for the detective in approximately a dozen narcotics purchases and nothing had occurred to make the detective question Van Nuys's truthfulness.

Another law enforcement agent had introduced Van Nuys to Detective Martin. The agent had told the detective that Van Nuys was facing criminal charges in federal court and he was willing to work as an informant in the Santa Cruz area.

On June 13, 2013, Detective Martin and other officers, all in plainclothes and equipped with two-way radios, were stationed in various locations. Before the buy, Detective Martin searched Van Nuys to ensure that he was not carrying any money, weapons, or drugs. The detective provided Van Nuys with $100 in twenty-dollar bills and an audio transmitter. Detective Martin turned on a video camera, which looked like a car key fob and held about a half an hour of memory, and handed it to Van Nuys. Van Nuys was instructed to go into the Beach Flats area of Santa Cruz in the vicinity of Poets Park and another nearby park.

During the controlled buy, unbeknownst to Van Nuys, the transmitter was also making a backup audio recording. Detective Martin had a high-power camera and an audio listening device with which to listen to any conversation in which Van Nuys engaged. The weather was clear, warm, and dry and it was daylight.

Van Nuys was never completely out of sight of the officers. Van Nuys was sitting on a park bench in Poets Park when he first saw a man riding down Raymond Street toward him. When the man was about five or six feet away and looking directly at Van Nuys, Van Nuys nodded his head and made eye contact with him. The man stopped next to Van Nuys and Van Nuys asked him if he knew where he could get some "black," the street term for tar heroin.

Agent Mancini, who was watching the park, informed Detective Martin that Van Nuys had made contact with a Hispanic man on a blue bicycle. The contact was made at approximately 3:35 p.m. The detective, who was not in visual contact, could

hear Van Nuys conversing with someone. The person spoke in English with a Spanish accent and had a "kind of a high pitched voice."

The bicyclist, who was wearing a white T-shirt and blue jeans, said it would cost $100 and Van Nuys said okay. The man had a military or buzz haircut and spoke broken English. Van Nuys was trying to take a good look at him. The man said he would be back in two minutes and took off down Park Place.

Agent Mancini reported that the Hispanic male on the bicycle was riding toward him, which Detective Martin knew from the agent's location was southbound toward the Beach Boardwalk. The man rode past Agent Mancini, who was not able to get a good view of him, and down Park Place. Van Nuys remained seated on the park bench.

About 10 minutes later, the man returned. Agent Mancini reported the bicyclist is returning. The man got off his bike on Park Place and stayed in the area where the street turns and becomes Uhden Street; he did not return to the bench where Van Nuys was sitting. The man motioned for Van Nuys to come over to him. Detective Martin heard the rustling of pants. The man walked quickly up Uhden Street and Van Nuys had to "hustle to catch up." The man stopped by a truck.

Deputy Hansen, another officer stationed in the vicinity, reported he had "a visual" of the bicyclist and Van Nuys walking up Uhden Street and moving behind a vehicle. As Van Nuys approached, the man set something, which was rolled up in a business card, down on the hood of a truck. The man asked Van Nuys whether he worked for the government, a question which Detective Martin heard, and Van Nuys indicated he did not. Van Nuys handed the money to the man and looked at him. While the man looked at the money, Van Nuys opened the package just a little bit to make sure heroin was in there. Van Nuys asked the man's name and the man replied "Chaparro," which means "shorty" in Spanish; the detective heard that exchange. The man rode quickly away on Uhden Street toward 3rd Street.

3

Deputy Hansen reported seeing the bicyclist traveling north on Uhden Street toward 3rd Street and Van Nuys walking in the opposite direction back toward the park. Detective Martin directed Deputy Hansen to attempt to follow the man.

Deputy Hansen saw the bicyclist make a left turn onto 3rd Street, a right turn onto the Riverside Bridge, a right turn onto San Lorenzo Boulevard, and a left turn onto Ocean Street. The deputy lost sight of him in the 100 block of Ocean Street.

Detective Martin received agents' reports that Van Nuys was returning to the park and he was headed to the detective's car. After about a half an hour, the video camera stopped recording. The video recording ends with Van Nuys leaving the drug deal and walking through and out of Poets Park.

About five seconds after the video ended, Van Nuys came into Detective Martin's view. When Van Nuys reached the detective's vehicle, he showed the detective what he had purchased, a small amount of heroin wrapped in cellophane and rolled in a business card. It was stipulated that substance was later found to contain heroin and have a gross weight, which included the packaging material, of .63 grams. The business card was for landscaping services and Rene Perez was listed as the "Owner/Operator" on the card.

Van Nuys had no money on him when he returned to Detective Martin. Van Nuys described the seller to Detective Martin as a very short Hispanic male who spoke with an accent, identified himself as "Chaparro," and rode a blue bicycle. Van Nuys told the detective that the transaction occurred behind a black truck parked on Uhden Street, Van Nuys paid $100 to the dealer, and the dealer placed the drugs on the hood of the vehicle.

At trial, Van Nuys identified defendant as the person with whom he did the transaction on June 13, 2013. Van Nuys explained that he had looked at the seller with the intent of remembering his face. He recognized defendant in still images taken from the video recording. He recognized the business card in which the heroin had been wrapped. Van Nuys had bought methamphetamine for himself from street dealers and, in

4

his experience, it was not uncommon for street dealers to provide contact information, such as a telephone number, to clients.

Van Nuys testified that he was a methamphetamine addict. He had a number of convictions for felony possession of narcotics and he was twice convicted of receiving or possessing stolen property. In September of 2011, Van Nuys was charged with possession with intent to distribute methamphetamine and heroin in a federal case. Two counts each carried a ten-year-to-life mandatory minimum sentence and a third count carried a five-year-to-life mandatory minimum sentence. As part of a plea deal requiring Van Nuys to testify against codefendants in the federal prosecution, the two more serious charges were dropped and he pleaded guilty to the lesser charge in 2011. The plea agreement also allowed Van Nuys the opportunity to potentially receive a sentence lower than the mandatory minimum, or perhaps even avoid prison altogether, pursuant to a government motion if Van Nuys provided substantial assistance to the government.[1] His sentencing was put over.

Van Nuys explained that during the previous year he had been working as a confidential informant and performing controlled buys. He had been working primarily with Detective Martin. As part of those operations, Van Nuys was instructed to take careful note of each seller's face, his clothing, the way the person spoke, and anything distinctive so that Van Nuys could later identify the seller. Van Nuys knew that he would be required to come into court and identify the seller.

Although the video recording of the drug transaction on June 13, 2013 did not provide a good view of everything, Detective Martin was able to stop the recording and

---

[1] See Federal Sentencing Guidelines, section 5K1.1 ("Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines").

5

retrieve some still images from the computer screen. One still image showed the suspect, wearing a white T-shirt, standing next to his blue bicycle near a black pickup truck. Another still image showed the suspect standing next to his bicycle and looking toward the camera. In that image, the man's face is dark but his short stature, body shape, clothing, and hairstyle can be seen. A third still image showed the suspect, a short Hispanic male, standing next to his bicycle. His clothing and his shoes can be seen; he is wearing a white T-shirt. While "[t]here is a little bit more light around the face area" in that image, the face is "still dark and hard to decipher." A fourth still image showed the suspect looking over his right shoulder as he is holding onto his bicycle. His hairstyle, facial features, and body shape can be seen. A fifth still image captured the suspect below the head. In it, he is wearing a white T-shirt, blue jeans, and white Nike tennis shoes. At trial, Detective Martin estimated, based on the video recording, that the suspect was between five feet and five feet, four inches tall.

Detective Martin provided some screen shots to an officer with the Santa Cruz Police Department, Karina Cecena, who worked in the general area of Beach Flats. He asked her to look for a matching suspect and "ID him."

On July 9, 2013, based on images provided to her by Detective Martin, Officer Cecena made contact with defendant while on patrol. He was sitting in the parking lot of a 7-Eleven on Laurel Street and next to him was a blue, Giants brand bicycle. Defendant was wearing a blue T-shirt, black cargo pants, and white Nike shoes. At trial, Officer Cecena identified defendant as the individual with whom she spoke on July 9, 2013.

Most of Officer Cecena's contact with defendant was conducted in Spanish. Defendant was very friendly and cooperative. Officer Cecena documented the contact on a field identification card (FI card). It stated defendant's name, Rene Perez Mendoza, his date of birth, his address of 127 Ocean Street and unit number, and his cell phone number. The FI card described defendant as a male Hispanic, five feet, two inches tall, weighing 145 pounds, with a medium build, short black hair, a goatee, brown eyes, and a

6

tattoo of "R" and "P" on the left, inner forearm. His occupation was reportedly a self-employed landscaper. Officer Cecena took photographs of defendant.

Officer Cecena subsequently called the cell phone number that defendant had provided and a male answered. When she asked to whom she was speaking, the person who answered said, "Rene."

Officer Cecena provided Detective Martin with photographs of defendant. She also provided the detective with the FI card from her contact with defendant.

In Detective Martin's opinion, the person in the photographs provided by Officer Cecena resembled the person in the video recording of the drug transaction with respect to facial features, hairstyle, and stature. Their shoes appeared to be the same. The detective did not believe that the bicycle in Officer Cecena's photographs and the bicycle in the video recording were same bicycle even though both were blue.

## II

### *Discussion*

#### A. *Rebuttal Closing Argument*

#### 1. *Background*

Defendant contends that the prosecutor improperly "lowered and shifted the burden of proof by repeatedly arguing that the jury had to believe several facts in order to find [him] not guilty." He asserts that the prosecutor, like the prosecutor in *People v. Centeno* (2014) 60 Cal.4th 659 (*Centeno*) and in *People v. Hill* (1998) 17 Cal.4th 800 (*Hill*), improperly "invited the jurors to jump to a conclusion based on a limited consideration of the evidence and trivialized and oversimplified the jury's task." He maintains that "the prosecutor was not discussing the treatment of circumstantial evidence" and, if the prosecutor was discussing the reasonableness of inferences from the circumstantial evidence, he "confound[ed] that concept with the concept of proof beyond a reasonable doubt." Defendant claims that the prosecutor's "comments made the trial fundamentally unfair because they prevented the jury from fairly considering all of the

7

evidence under the high standard of proof beyond a reasonable doubt." He argues that reversal is required because the prosecutorial misconduct was not harmless beyond a reasonable doubt.

In his rebuttal argument, the prosecutor told the jury that his burden was to establish the case beyond a reasonable doubt but he was not required to eliminate all doubt. He urged the jurors to "impartially compare and consider all evidence" when they were trying to decide whether he had met that burden.

Without objection, the prosecutor argued: "And when you are considering whether I prove this case beyond a reasonable doubt, it's pretty much this: [¶] Do you find it reasonable, what the defense is presenting as far as argument, that it was not his client? And to believe the defense, is it reasonable? . . . [I]f you find that I have not met my burden, obviously, the defendant walks out. He's not guilty. But in order to believe the defense's theory and find the defendant not guilty, you are pretty much saying Mr. Van Nuys was willing to risk his bargain for this defendant, this small time offense here."

The prosecutor continued: "To believe the defense theory is that there's a person that looks like the defendant, speaks broken English, is a Spanish speaker, and that person that looks like the defendant and is a Spanish speaker with broken English is dealing drugs within a half mile of the defendant's house, and to believe . . . the defense theory that that person that looks like the defendant, has broken English, selling drugs within a half mile of the defendant's house, also has the defendant's business card on him, looks like the defendant. [¶] And this business card that's on this person that looks like the defendant who is selling drugs within a half mile of the defendant's house not only has his business card, but the business card with accurate information relevant to the defendant, also has similar, if not the same, kind of shoes as the defendant. You have to believe . . . all that has been coincidence."

8

At this point, defense counsel objected that the prosecutor's argument "shifts the burden of proof." The court thereupon informed the jurors: "Ladies and gentlemen, with respect to arguments, that's just essentially what they are. You are to follow the law as I instruct you in terms of the burden of proof."

The prosecutor then continued: "So in order to believe the defense theory or believe that the defendant is not guilty, you have to believe that there's a person out there who—" Defense counsel interrupted by objecting that the argument was "a total burden shift" and he asserted that "[y]ou don't have [to] believe those things to find not guilty here." The trial court then stated: "The burden is upon the People to prove the defendant committed the crime. Okay? [¶] So with that in mind, you may continue your argument, Mr. Delgadillo."

Defense counsel argued: "In order to find the defendant not guilty, you have to believe that there's a person out there that looks like the defendant, speaks broken English, is carrying the defendant's business card, is dealing drugs within a half mile of the defendant's house, is wearing similar, if not the same, shoes, and when he's finished with the transaction, goes within the same block of the defendant's house. Is that reasonable? [¶] Ladies and gentlemen, . . . I will tell you, obviously not."

After the prosecutor had finished his argument, defense counsel indicated that he wanted to request a jury admonition before the court gave its final instructions and sent the jury to deliberate. A discussion was held at the sidebar. On the record, out of the jury's presence, defense counsel asserted that the jurors merely had to find that the prosecutor had not met the burden of proof and the prosecutor's argument had imposed "a proof burden" on the defense. The trial court found the prosecutor's argument concerned the reasonable inferences to be drawn from circumstantial evidence. Defense counsel asked the trial court to give an admonition that "the only thing that the jury need find to return a not guilty verdict is that they do not have an abiding conviction that the defendant is guilty beyond a reasonable doubt." The court denied the request.

9

2. *Analysis*

The cases relied upon by defendant are distinguishable. In rebuttal closing argument in *Centeno*, *supra*, 60 Cal.4th 659, the prosecutor used "a diagram showing the geographical outline of California" and posited a hypothetical criminal case to explain the People's burden of proof (*id*. at pp. 664, 676) and then "urged the jury to convict based on a 'reasonable' view of the evidence." (*Id*. at p. 662.) The California Supreme Court observed that "[c]ourts have repeatedly cautioned prosecutors against using diagrams or visual aids to elucidate the concept of proof beyond a reasonable doubt [citations] . . . ." (*Ibid*.) The court concluded that "[t]he argument unduly risked misleading the jury about the standard of proof" and reversed the judgment. (*Ibid*.)

The Supreme Court explained: "The use of an iconic image like the shape of California or the Statue of Liberty, unrelated to the facts of the case, is a flawed way to demonstrate the process of proving guilt beyond a reasonable doubt. These types of images necessarily draw on the jurors' own knowledge rather than evidence presented at trial. They are immediately recognizable and irrefutable. Additionally, such demonstrations trivialize the deliberative process, essentially turning it into a game that encourages the jurors to guess or jump to a conclusion." (*Centeno*, *supra*, 60 Cal.4th at p. 669.) The court emphasized that jurors "may not go beyond the record to *supply* facts that have not been proved" and it is "misleading to analogize a jury's task to solving a picture puzzle depicting an actual and familiar object unrelated to the evidence." (*Id*. at p. 670.) The prosecutor in this case, however, did not use an iconic image to illustrate the burden of proof.

The Supreme Court in *Centeno* was also troubled by a separate problem with the prosecutor's argument, namely that the argument "strongly implied that the People's burden [of proof] was met if [the People's] theory was 'reasonable' in light of the facts supporting it." (*Centeno*, *supra*, 60 Cal.4th at p. 671.) While the prosecutor may permissibly "argue that the jury may reject impossible or unreasonable interpretations of

10

the evidence and to so characterize a defense theory[] [citations]," it is "error for the prosecutor to suggest that a 'reasonable' account of the evidence *satisfies the prosecutor's burden of proof*." (*Id*. at p. 672.) In that case, the prosecutor had improperly "left the jury with the impression that so long as her interpretation of the evidence was reasonable, the People had met their burden." (*Ibid*.)

The Supreme Court made clear that, while a prosecutor is entitled to "point out that interpretations proffered by the defense are neither reasonable nor credible" (*Centeno*, *supra*, 60 Cal.4th at p. 673), it is "error to state that 'a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence.' [Citations.]" (*Ibid*.) "[E]ven if the jury rejects the defense evidence as unreasonable or unbelievable, that conclusion does not relieve or mitigate the prosecutorial burden [of proof]." (*Ibid*.) It concluded: "[T]he prosecutor did not simply urge the jury to ' "accept the reasonable and reject the unreasonable" ' in evaluating the evidence before it. [Citation.] Rather, she confounded the concept of rejecting unreasonable inferences, with the standard of proof beyond a reasonable doubt. She repeatedly suggested that the jury could *find defendant guilty* based on a 'reasonable' account of the evidence. These remarks clearly diluted the People's burden."[2] (*Centeno*, *supra*, at p. 673.) In this case, however, the prosecutor did not suggest that he had met the burden of proof by merely offering a reasonable interpretation of the circumstantial evidence.

---

**2** Although the court in *Centeno* determined that defendant had forfeited his claim of prosecutorial misconduct by failing to timely object, the Supreme Court reversed the judgment for ineffective assistance of counsel. (*Centeno*, *supra*, 60 Cal.4th at pp. 674-678.) It could "conceive of no reasonable tactical purpose for defense counsel's omission" in failing to object to the prosecutor's rebuttal argument. (*Id*. at p. 676.) It found that, "[g]iven the closeness of the case and the lack of any corrective action, there is a reasonable probability that the prosecutor's argument caused one or more jurors to convict defendant based on a lesser standard than proof beyond a reasonable doubt." (*Id*. at p. 677)

In *Hill*, *supra*, 17 Cal.4th at p. 831, the prosecutor repeatedly indicated to the jury in rebuttal closing argument that there must be some evidence on which the jury could base a doubt. The California Supreme Court stated: "[The prosecutor's] comments are somewhat ambiguous. [The prosecutor], however, committed misconduct insofar as her statements could reasonably be interpreted as suggesting to the jury she did not have the burden of proving every element of the crimes charged beyond a reasonable doubt. (*People v. Marshall* [(1996)] 13 Cal.4th [799,] 831; *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1215.) Further, to the extent [the prosecutor] was claiming there must be some affirmative evidence demonstrating a reasonable doubt, she was mistaken as to the law, for the jury may simply not be persuaded by the prosecution's evidence. (Cf. CALJIC No. 2.61 (6th ed. 1996 bound vol.) ['the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charge'].)" (*Id*. at pp. 831-832.) It stated: "Although the question arguably is close, . . . it is reasonably likely [the prosecutor's] comments, taken in context, were understood by the jury to mean defendant had the burden of producing evidence to demonstrate a reasonable doubt of his guilt. Accordingly, we conclude [the prosecutor] committed misconduct by misstating the law."[3] (*Id*. at p. 832.)

In this case, the prosecutor did not suggest that defendant had a duty or burden to produce evidence raising a reasonable doubt as to his guilt or proving his innocence. The prosecutor's argument was in essence that the cumulative circumstantial evidence was susceptible to only one reasonable inference, namely that defendant sold heroin to

_____

[3] In *Hill*, the Supreme Court found many more instances of prosecutorial misconduct. It stated: "[A]lthough we might find any individual instance of prosecutorial misconduct or other error harmless standing alone, we cannot ignore the combined prejudicial effect these many missteps had on the overall fairness of the trial. Finding the cumulative prejudice flowing from the combination of prosecutorial misconduct and other errors rendered defendant's trial fundamentally unfair, we reverse the judgment in all respects." (*Hill*, *supra*, 17 Cal.4th at p. 815; see *id*. at pp. 845-847.)

12

Van Nuys on June 13, 2013. Although the prosecution indicated that the jurors would have to reject that circumstantial evidence and the reasonable inferences drawn from that evidence in order to find the defendant not guilty, it is not reasonably likely that the jury understood the prosecutor's argument as lowering or shifting the burden of proof.

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]' [Citation.]" (*Centeno*, *supra*, 60 Cal.4th at p. 667.) " 'When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for "[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade." [Citation.]' [Citation.]" (*Id*. at p. 676.)

Here, the trial court instructed: "[B]efore you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence and one of those reasonable conclusions point to the innocence and another to guilt, you must accept the one that points to innocence." It fully instructed the jury on the presumption of innocence and the People's burden of proving defendant guilty beyond a reasonable doubt.[4] It also told the jury: "You must follow the law as I explain it to you even if you

---

[4] The trial court instructed: "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt. [¶] Proof beyond a reasonable doubt is proof (continued)

13

disagree with it. If you believe that the attorneys comments on the law conflict with my instructions, you must follow my instructions."

Closing argument followed the court's general instructions to the jury. In response to defense counsel objections during the prosecutor's rebuttal argument, the trial court reminded the jury that argument was merely argument, directed the jury "to follow the law as I instruct you in terms of the burden of proof," and it reiterated that it was the People's burden "to prove the defendant committed the crime."

In light of the entire argument and instruction, we find no reasonable likelihood that the jurors understood the prosecutor's argument as reducing the People's burden of proof or imposing any evidentiary burden on the defense.

B. *Detective Martin's Testimony*

1. *Objection on the Ground of "Inappropriate Opinion"*

According to defendant, the court improperly allowed the prosecutor, over defense counsel's objection, to elicit Detective Martin's opinion as to whether Van Nuys's identification of him was credible. He asserts that the court's evidentiary ruling was error because "a police officer cannot opine on the veracity of particular statements" made by a witness.

Defendant mischaracterizes the record. Detective Martin was not giving his opinion as to the credibility of Van Nuys's identification of defendant. Rather, he was answering a series of question related to the repercussions or consequences that

that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. In deciding whether the [P]eople have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. [¶] Unless the evidence proves defendant guilty beyond a reasonable doubt, he is entitled to an acquittal, and you must find him not guilty." The court further instructed: "The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty."

14

Van Nuys would experience if he lied or was dishonest with the detective or anyone in the undercover operation.

The prosecutor asked Detective Martin. "[A]re you aware that there was any repercussions or consequences if Mr. Van Nuys lies or is dishonest with you or anyone from the operation?" The detective answered yes. The prosecutor inquired, "And what are those consequences that you are aware of?" The detective answered, "If he's deemed unreliable, meaning dishonest or untrustworthy, his employment with the task force ends, and whatever case consideration he had with the federal courts would end also." The prosecutor then asked, "What would make Mr. Van Nuys unreliable?" Detective Martin indicated that Van Nuys would be deemed unreliable "[i]f he was untrustworthy" or "if he was lying or stealing." The prosecutor asked, "Would that include pointing a finger at someone that was not part of a drugs transaction?" At this point, defense counsel objected on several grounds, including "inappropriate opinion." The objection was overruled and Detective Martin answered, "That would be untrustworthy and lying."

Detective Martin's testimony indicated that Van Nuys had a motivation to tell the truth so that he would be considered a reliable informant and secure the benefit of his agreement to participate in the undercover operations. A "jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to" "[t]he existence or nonexistence of a bias, interest, or other motive." (Evid. Code, § 780, subd. (f); see Evid. Code, § 210 ["relevant evidence" defined].)

Detective Martin did not give his opinion regarding accuracy or truthfulness of Van Nuys's statement identifying defendant as the heroin seller. Therefore, the cases cited by defendant concerning the impropriety of a lay witness giving his opinion regarding the veracity of another's statement are inapposite. Defendant has failed to show the trial court abused its discretion in overruling the "inappropriate opinion" objection.

15

## 2. *"Photos Speak for Themselves"* and *"Improper Speculation"* Objections

At trial, the prosecutor asked Detective Martin a number of questions about the photographs taken of defendant by Officer Cecena. The prosecutor inquired, "Now, is there anything about these photographs [provided by Officer Cecena] that caught your attention related to your investigation." The detective answered yes. The prosecutor said, "Tell us." The detective responded, "One, that the person in this photo resembled the person in my videos of the drug transaction." He added, "Both in facial features, hairstyle, stature, as well as I noted that the shoes were the same shoes, same brand." Defense counsel objected to, and moved to strike, the word "same" and the trial court sustained the objection.

The prosecutor then asked Detective Martin, "Anything about the shoes [in Cecena's photographs] that caught your attention in relation to the investigation and what you have as far as these still photographs?" Defense counsel interposed an objection on the ground the "photos speak for themselves" and the court overruled it. Defense counsel immediately objected on grounds of "improper speculation" and the court overruled that objection as well. The prosecution posed the question again, "Detective, anything about the shoes that related to the photographs in the still shots?" The detective answered, "The shoes that this person was wearing when he was photographed by Officer Cecena appear to be the same shoes that our suspect was wearing."

Defendant now argues that Detective Martin's opinion regarding the similarity of the photographs of defendant and the still images of the heroin seller was inadmissible on a number of different grounds. Defendant claims that a witness generally cannot testify to the ultimate inferences to be drawn from the evidence[5] and quotes from an opinion

---

[5] We note that "[t]estimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (Evid. Code, § 805.)

16

recognizing the limited admissibility of lay opinion regarding the veracity of another person's statement.  (See *People v. Melton* (1988) 44 Cal.3d 713, 744.)  He maintains that the jurors "could assess the photos for themselves and determine [whether] there were any similarities between the persons in the two sets of photos" and they "did not need any special expertise from Martin or anyone else, in order for them to view and compare the photos."  Defendant also asserts that it was "simply irrelevant whether the subject in the two sets of photos looked similar" and "Cecena's photos . . . merely confused the issue" as to "whether [he] was the person who sold the heroin . . . ."

Defendant's general assertions go beyond the objections actually interposed and overruled.  "Evidence Code section 353, subdivision (a) allows a judgment to be reversed because of erroneous admission of evidence only if an objection to the evidence or a motion to strike it was 'timely made and so stated as to make clear the specific ground of the objection.' "  (*People v. Demetrulias* (2006) 39 Cal.4th 1, 20.)  "To satisfy Evidence Code section 353, subdivision (a), the objection or motion to strike must be both timely *and* specific as to its ground.  An objection to evidence must generally be preserved by specific objection at the time the evidence is introduced . . . ."  (*Id*. at p. 22.)  To the extent that defendant is now raising claims beyond his specific evidentiary objections at trial, he forfeited them.

Defendant alternatively suggests that insofar as defense counsel failed to timely object to the admission of Detective Martin's testimony on the grounds now raised, counsel should be excused on grounds of futility.  Nothing in the appellate record supports a claim of futility.

We next consider the specific objections interposed by defense counsel.  An objection that something "speaks for itself" is not a specific evidentiary objection under California law although courts have sometimes treated it as an objection under the former best evidence rule (now the secondary evidence rule).  (See e.g. *People v. Sloss* (1973) 34 Cal.App.3d 74, 86; *Brown v. Southern Pacific Co*. (1949) 92 Cal.App.2d 639, 646;

*Akopoff v. Mesropian* (1929) 96 Cal.App. 128, 129.) Defense counsel's objection that "photos speak for themselves" did not preserve an objection that the testimony was irrelevant or beyond the proper scope of expert or lay opinion. (See Evid. Code, § 353; *People v. Marks* (2003) 31 Cal.4th 197, 228 ["A general objection to the admission or exclusion of evidence, or one based on a different ground from that advanced at trial, does not preserve the claim for appeal."]; *People v. Gutierrez* (1993) 14 Cal.App.4th 1425, 1434 [objection on ground of vagueness was insufficient to preserve issue whether testimony was beyond proper scope of expert testimony].)

We nevertheless assume without deciding that defendant's "improper speculation" objection preserved a limited objection that the question asked for conjectural lay opinion. (See Evid. Code, §§ 702, subd. (a) [testimony of lay witness "concerning a particular matter is inadmissible unless he has personal knowledge of the matter"], 800, subd. (a) [generally, a lay witness's testimony in the form of an opinion must be "[r]ationally based on the perception of the witness"].) " '[A]n examiner's question asking a lay witness to testify to facts that the witness has not personally observed, or to state an opinion not based on his or her own observations, calls for speculation and conjecture by the witness and is prohibited by' Evidence Code sections 702 and 800. (1 Jefferson's Cal. Evidence Benchbook, [(Cont.Ed.Bar 4th ed. 2013) Competency, Examination, and Credibility of Witnesses], § 28.56, p. 534.)" (*People v. Rodriguez* (2014) 58 Cal.4th 587, 631.) But, to the extent that defendant is now arguing that Detective Martin's lay opinion was inadmissible because it was not helpful to the jurors, who were equally able to evaluate the photos and the video recording and still images, that objection was forfeited because defense counsel did not object on that specific ground below. (See Evid. Code, §§ 353, 800, subd. (b) [lay witness's testimony in the form of an opinion must additionally be "[h]elpful to a clear understanding of his testimony"].)

18

As to the limited evidentiary objection cognizable on appeal, we find *People v. Leon* (2015) 61 Cal.4th 569 (*Leon*) instructive.  In *Leon*, the defendant objected at trial that a detective's identification of him as the person in a surveillance video of a robbery was inadmissible lay opinion.  (*Id*. at p. 600.)  On appeal, the defendant contended that "the trial court erred when it allowed a detective to identify him as the person shown on the surveillance videos of two robberies."  (*Ibid*.)

The California Supreme Court reviewed the relevant law: "A lay witness may offer opinion testimony if it is rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony.  (Evid.Code, § 800.)  '[T]he identity of a person is a proper subject of nonexpert opinion . . . .'  (*People v. Perry* (1976) 60 Cal.App.3d 608, 612 (*Perry* ); accord, *People v. Mixon* [(1982)] 129 Cal.App.3d [118,] 127 (*Mixon*).)"  (*Leon*, *supra*, 61 Cal.4th at p. 601.)  Appellate courts review a trial court's ruling on an objection of improper lay opinion for abuse of discretion.  (*Id*. at p. 600.)

"Court of Appeal decisions have long upheld admission of testimony identifying defendants in surveillance footage or photographs.  In *Perry*, the defendant argued an identification had to be based on the officer's perception of a crime.  (*Perry*, *supra*, 60 Cal.App.3d at p. 613.)  The court disagreed, finding it proper for officers to predicate their opinion on 'contacts with defendant, their awareness of his physical characteristics on the day of the robbery, and their perception of the film taken of the events.'  (*Ibid*.)  The testimony was also helpful because the defendant had changed his appearance by shaving his mustache before trial.  (*Ibid*.)  Similarly, the court in *Mixon*, upheld identification of the defendant in a robbery surveillance photograph by officers who had numerous contacts with him and were unequivocal in their identification.  (*Mixon*, *supra*, 129 Cal.App.3d at pp. 130-131; see also *People v. Ingle* (1986) 178 Cal.App.3d 505, 514 [allowing similar testimony by robbery victim based on her observation of defendant during the crime].)"  (*Leon*, *supra*, 61 Cal.4th at p. 601.)

Defendant Leon attempted to distinguish the foregoing cases on the ground that the detective "did not have contact with him *before* the crimes. (See *People v. Ingle*, *supra,* 178 Cal.App.3d at p. 513.)" (*Leon*, *supra*, 61 Cal.4th at p. 601.) The Supreme Court concluded that was "a distinction without a difference." (*Ibid.*) The detective was "familiar with defendant's appearance around the time of the crimes" since "[t]heir contact began when defendant was arrested . . . ." (*Ibid.*) The court made clear that "[q]uestions about the extent of [the detective's] familiarity with defendant's appearance went to the weight, not the admissibility, of his testimony. (*Perry*, *supra*, 60 Cal.App.3d at p. 613.)" (*Ibid.*)

*Leon* and the line of cases discussed in *Leon* are not applicable here since Detective Martin did not identify defendant as the heroin seller in the video recording or the still images of the controlled buy. Consequently, the detective's familiarity with defendant's appearance was not at issue. His comparison of defendant's shoes in the photographs taken by Officer Cecena and the perpetrator's shoes shown in the still images from the video recording of the controlled buy was based on his personal observation of those pictures.

Even if we assume arguendo that the trial court should have sustained the defense objection of "improper speculation" to Detective Martin's testimony about the shoes, we discern no basis for reversal. (Cal. Const., art. VI, § 13 [no reversal for improper admission of evidence unless it resulted in a miscarriage of justice]; Evid. Code, § 353, subd. (b) [same].) Jurors saw the photographs of defendant and the video recording and still images of the controlled buy and were able to compare the appearance of defendant's shoes and the perpetrator's shoes for themselves. Defendant has failed to establish that there is a reasonable probability the jury would have reached a different result had the court sustained defense counsel's "improper speculation" objection. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [a miscarriage of justice is declared when "it is reasonably probable that a result more favorable to the appealing party would have been reached in

20

the absence of the error."]; *id*. at p. 837 [standard is "based upon reasonable probabilities rather than upon mere possibilities"].)

C. *Alleged Ineffective Assistance of Counsel*

1. *Detective Martin's Testimony Regarding the Similarities of the Images*

Defendant alternatively argues that trial counsel was ineffective because he failed to timely object, on the grounds now raised, to Detective Martin's testimony regarding the resemblance of defendant as he appeared in Officer Cecena's photographs and the heroin seller as captured in the video recording of the drug buy. To prevail on an ineffective assistance of counsel claim, a defendant must satisfy a two-part test by establishing both counsel's deficient performance and prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-689, 694 (*Strickland*).) A reviewing court may dispose of a claim of ineffective assistance of counsel without addressing both components if a defendant makes an insufficient showing as to either prong. (*Strickland*, *supra*, at p. 697.)

To establish prejudice, a defendant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694.) "In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. [Citations.]" (*Harrington v. Richter* (2011) 562 U.S. 86, 111.) "The likelihood of a different result must be substantial, not just conceivable. [Citation.]" (*Id*. at p. 112.)

Here, the jurors saw and evaluated the video recording and still images of the controlled buy and the photographs of defendant taken by Officer Cecena less than a month later and they also observed defendant at trial. Van Nuys identified defendant as the person who sold heroin to him on June 13, 2013 and provided him with defendant's business card. Van Nuys had looked at the seller with the intention of remembering what

he looked like. Defendant lived in the 100 block of Ocean, which is where Deputy Hansen lost sight of the person who sold heroin to Van Nuys on June 13, 2013. Defendant has not shown there is a reasonable probability that the result of the proceeding would have been different had defense counsel timely and specifically objected to Detective Martin's testimony on the grounds now advanced. Consequently, we reject this ineffective assistance of counsel claim.

2. *Officer Cecena's Testimony Regarding Her Reason for Contacting Defendant*

On direct examination, Officer Cecena testified that Detective Martin gave her screen shots with instructions to look for a subject that matched the description. She then testified that, while driving around, she "noticed a subject that matched the description of the photos that Detective Martin sent to [her]." Defense counsel moved to strike and then, out of the presence of the jury, made a motion for a mistrial on the ground that the prosecution had violated an in limine ruling. The court stated that it had granted the "request that the officer not be allowed to express an opinion before the jury that the defendant, in her opinion, is, in fact, the person that was in the photograph."

When the jury returned, the trial court instructed the jury: "Ladies and gentleman, the issue of the identity of the person who allegedly sold the contraband in this case is an issue for the jury to determine. This officer has indicated that, in her opinion, an individual matched the person depicted in a photograph she was provided. [¶] The Court is allowing that testimony for the very limited purpose of explaining the officer's conduct insofar as contacting and detaining an individual that will be described later in her testimony. [¶] It is not something that you can consider and use in making the determination as to the identity of the perpetrator of the crime alleged in this case."

Officer Cecena then confirmed that she made contact with defendant on July 9, 2013 because of a photograph provided to her by Detective Martin. When the trial court gave its general instructions to the jury before deliberations, it stated: "During the trial, certain evidence was admitted for a limited purpose. Here Officer Cecena used the word

22

"match" to explain why she contacted Mr. Mendoza. You may consider that evidence only for the purpose and no other. It is not evidence that Mr. Mendoza was, in fact, the man in the picture."

Defendant now asserts that defense counsel provided ineffective assistance by failing to raise a relevancy objection to Cecena's testimony as to her reason for stopping defendant. He argues that counsel had no tactical reason for not objecting to that testimony. Even if we assume that defense counsel should have objected on relevance grounds (see *People v. Lucero* (1998) 64 Cal.App.4th 1107, 1109-1110), defendant fails to establish prejudice. (*See Strickland*, *supra*, 466 U.S. at pp. 687-689, 694, 697; *Harrington v. Richter*, *supra*, 562 U.S. at pp. 111-112.) In light of all the evidence and the court's limiting instructions, defendant has not shown "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, at p. 694.)

D. *Cumulative Error*

Defendant argues that multiple errors were cumulatively prejudicial and rendered his trial fundamentally unfair. "Defendant was entitled to a fair trial but not a perfect one. [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) This is not a case where cumulative prejudice from multiple trial errors requires reversal. (Cf. *Hill*, *supra*, 17 Cal.4th at pp. 844-847.)

DISPOSITION

The judgment is affirmed.

 

 

 

 

 

_____
ELIA, J.

WE CONCUR:

_____
RUSHING, P. J.

_____
WALSH, J.[*]

*The People v. Mendoza*
H040647

---

[*]Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.